UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dr. Hamid Abbasi and MWBS
Holdings, LLC,

        Plaintiffs,

v.

Leading Edge Aviation Services, Inc.,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-295 ADM/KMM

___

Donald Chance Mark, Jr., Esq., Tyler P. Brimmer, Esq., and Christopher R. Sall, Esq., Fafinski Mark & Johnson, P.A., Eden Prairie, MN, on behalf of Plaintiffs.

Timothy R. Schupp, Esq., Ryan O. Vettleson, Esq., and Daniel P. Brees, Esq., Gaskins Bennett Birrell Schupp, LLP, on behalf of Defendant.

___

## I. INTRODUCTION

On July 18, 2017, the undersigned United States District Court Judge heard oral argument on Defendant Leading Edge Aviation Services, Inc.'s ("Leading Edge") Motion for Summary Judgment [Docket No. 48]. Plaintiffs Dr. Hamid Abbasi ("Dr. Abbasi") and MWBS Holdings, LLC ("MWBS") oppose the Motion. For the reasons set forth below, Leading Edge's Motion is granted.

## II. BACKGROUND

In November 2012, Dr. Abbasi, through his company MWBS, purchased a 2010 Cirrus SR22T aircraft (the "Aircraft"). Sall Decl. [Docket No. 54] Ex. 13. On March 29, 2013, while piloting the Aircraft on approach to the Alexandria, Minnesota Municipal Airport, the Aircraft experienced a malfunction of the right flap. Sall Decl. Ex. 10 ("Dr. Abbasi Dep.") 168:23–169:4. After unsuccessfully attempting to correct the problem through piloting

maneuvers, Dr. Abbasi deployed the Aircraft's parachute system. Id. 178:24–179:1. The parachute system allowed Dr. Abbasi, his wife, and two children to walk away from the crash, but the Aircraft was a total loss.

Dr. Abbasi alleges that when Leading Edge performed maintenance on the Aircraft's right flap between November 2010 and August 2011, it failed to properly install the safety wire on the mounting bolt on the right flap actuation fitting. See Compl. [Docket No. 1-1]. This allegedly allowed the flap rod end to disconnect from the flap actuation fitting, causing the Aircraft's de-stabilization and subsequent crash.

**A. The Aircraft's History Prior to Being Purchased by Dr. Abbasi**

In November 2010, the Aircraft that was then owned and piloted by John Dutchak ("Dutchak"), struck a parked truck while taxiing in Clearwater, Florida. Sall Decl. Ex. 1 ("Holloran Dep.") 17:2–4; 41:18–25. Although the Aircraft was only traveling 5 miles per hour, the crash caused extensive damage to the Aircraft. Id. 42:1–6. Isaiah Holloran ("Holloran"), a flight instructor at the flight school Dutchak attended, determined the Aircraft to be unairworthy as a result of the accident. Id. 42:9–11.

After learning of the accident, Leading Edge's Director of Maintenance, Steve Miller ("Miller"), drove to Clearwater to inspect the Aircraft. Sall Decl. Ex. 2 ("Miller Dep.") 82:9–14. During his initial inspection, Miller observed damage to the Aircraft's wing tip, the outboard TKS panel, flaps, and the wing root fairing. Id. 75:7–22. Miller completed initial repairs in Clearwater, and obtained a Special Flight Permit to pilot the Aircraft to Leading Edge's facility in Tampa, Florida for further maintenance. Id. 76:9–25; Sall Decl. Ex. 3.

On November 18, 2010, Leading Edge created a shop order for the Aircraft. Sall Decl.

2

Ex. 4. The shop order noted eight discrepancies, including damage to the left wing tip, cracks on the aft floor under the rear seats, and composite damage in the fuselage skin under the left wing aft spar attach clip. Id.

Leading Edge performed repair and maintenance on the Aircraft over the following eight months. Id. Miller recorded the work performed in the Aircraft's logbook. Miller Dep. 39:12–24; Sall Decl. Ex. 5. One logbook entry specifically noted that "R&R both left and right flaps with new flaps P/N 16891-001-05 & P/N 16891-002-05 as required." Sall Decl. Ex. 5. "R&R" is an abbreviation for removed and replaced. Miller Dep. 86:17–20.

To remove and replace the right flap, Miller needed to remove the safety wire on the bolt in the Aircraft's right flap linkage. Id. 91:6–9. Although the same bolt could be reused once the repairs were made, safety wires may only be used once, so a new safety wire needed to be installed. Id. 71:19–72:6. Miller testified that when he examined the Aircraft after all the maintenance had been completed, "clearly without question the safety wire was present." Id. 9:11–13.

Miller signed off on the repairs in an August 3, 2011 logbook entry. Sall Decl. Ex. 5. That same day, Paul Stern ("Stern"), Leading Edge's shop foreman, performed an annual inspection of the Aircraft. Id. 38:14–16; Sall Decl. Ex. 6; Schupp Aff. [Docket No. 51] Ex. 7 (collectively, "Stern Dep.") 22:6–9. Stern's standard practice prior to performing an inspection is to review the logbook to see if any major repair work had recently been completed. Stern Dep. 21:22–6. Stern testified that by reviewing the logbook, he would have been aware that the Aircraft recently underwent repair and maintenance work, including maintenance on the Aircraft's right wing flap. Id. 21:20–24; 22:25–23:4. Stern further testified that his annual

inspection would have included inspecting the maintenance that was performed on the Aircraft's right wing flap. Id. 22:25–23:7. Stern also testified that, although he could not explicitly recall the condition of the Aircraft's flap, he would have specifically looked to ensure that the bolt on the right wing flap assembly was safety wired. Id. 23:8–21. During the annual inspection, Stern performed service bulletin SB 2X-27-16 R1, a flap actuator modification, which required replacing a piece of hardware due to the rod ends length changing. Id. 31:12–32:24. This work did not require Stern to manipulate any of the hardware on the wing flap itself, and all the work was performed in the Aircraft's fuselage. Id. 33:4–8.

While performing his inspection, Stern used a checklist that had a specific check-off for the security of bolts. Id. 48:12–22. Stern testified that he understood the inspection for the security of bolts included checking for the presence of safety wire. Id. 48:23–49:1. Although Stern recalls the Aircraft being in the shop, he was unable to specifically remember inspecting this Aircraft. Id. 6:12–20. Relying on his past practice, Stern nevertheless testified that his signature on the annual inspection means that safety wire was in place. Id. 49:5–10.

On August 3, 2011, the same day Miller logged his repairs and Stern logged his annual inspection, Cirrus Design Corporation Test Pilot Nathan Alm ("Alm") performed a post-maintenance test flight of the Aircraft. Sall Decl. Ex. 7; Schupp Aff. Ex. 2 (collectively, "Alm Dep.") 23:4–10; 56:1–3; Sall Decl. Ex. 9. Prior to the test flight, Alm reviewed the Aircraft's logbook so he could verify during his pre-flight inspection that the repairs noted in the logbook had been performed. Alm Dep. 29:6–22; 31:2–14. Alm's review of the Aircraft prior to the test flight is a more extensive pre-flight review, and includes an intensive inspection of all areas noted in the maintenance entries as having been repaired. Id. 31:15–19; 32:17–20. Alm testified

4

that "you're going to be down on your hands and knees and - and verifying all the connections, the safety wires and - and whatnot that are throughout." Id. 31:24–32:2.

Alm stated that he was responsible for making sure the Aircraft was in an airworthy condition before the flight, and that if safety wires were missing the Aircraft would not be in an airworthy condition. Id. 56:7–15. Thus, to ensure the Aircraft was airworthy, Alm would check for the presence of safety wire on both the right and left flaps. Id. 56:16–22. Alm testified that he checks for safety wire on the flap rod end during every pre-flight, and that he would not have flown the Aircraft if the safety wires were missing. Id. 50:9–22.

After Alm's test flight, Dutchak and Holloran traveled to Leading Edge's facility to pick up the Aircraft. Holloran Dep. 35:16–18. Upon arriving at Leading Edge, Dutchak and Holloran performed an extensive pre-flight walk-through, spending 30 minutes to an hour inspecting the Aircraft rather than their usual ten minute walk-around. Id. 35:19–36:15. Neither Dutchak nor Holloran were licensed mechanics certified to perform repairs, conduct annual inspections, or certify an aircraft as airworthy, and they did not use a checklist to complete their walk-through. Id. 36:21–25; 40:24–41:10; Stern Dep. 50:23–51:3. When asked about the safety wires on the flaps, Holloran testified that he did not have a specific recollection of seeing them, but that he would not have flown the Aircraft if the safety wires were missing. Holloran Dep. 37:4–18. Holloran also testified that it was his custom and practice to ensure safety wires were in place prior to flying a Cirrus airplane, and that it was something he checked before every flight. Id. 37:18–38:2. Holloran stated that the Aircraft flew like "brand new" after the repair. Id. 39:17–19.

On July 10, 2012, the Aircraft underwent another annual inspection at Leading Edge's

5

facilities. Sall Decl. Ex. 10. Former Leading Edge employee Jonathan Bennett ("Bennett") completed the inspection. Id. Bennett was unable to specifically recall whether he checked the Aircraft's flaps or saw that the safety wire was installed as part of his inspection. Sall Decl. Ex. 11; Schupp Aff. Ex. 8 (collectively, "Bennett Dep.") 63:4–9. Bennett, however, followed the Aircraft's Maintenance Manual's checklist when conducting his inspection. Id. 23:4–6. The checklist provides a list of items that need to be completed as part of the annual inspection. Id. 23:7–10. It was Bennett's practice to follow the checklist and verify each item on the list. Id. 23:11–13. Bennett testified that at part of his annual inspection, he "absolutely" would look for the presence of safety wire on the bolts that connect various components of the wing assembly. Id. 23:19–24:2. The checklist itself demands that bolts are checked for "security," and that the visual inspection consists of checking for "safety wiring" on bolts and nuts. Schupp Aff. Ex. 9. Based upon his checklist and the annual inspection signoff, Bennett testified without qualification that safety wires were present on the Aircraft. Bennett Dep. 78:18–79:3.

**B. Dr. Abbasi Purchases the Aircraft**

On November 5, 2012, Dr. Abbasi purchased the Aircraft. Sall Decl. Ex. 13. Prior to completing the purchase, Douglas Duncan Aviation ("DDA") performed a pre-purchase examination of the Aircraft.[1] Dr. Abbasi Dep. 21:4–14. No discrepancies related to the wing flaps were found. Sall Decl. Ex. 15.

Because Dr. Abbasi bought the Aircraft before he was licensed to fly, professional pilot Mark Wages ("Wages") flew the Aircraft from its pre-purchase location in North Carolina to

---

[1] DDA was a named defendant in this action, but was dismissed on July 26, 2016 for lack of personal jurisdiction. See Mem. Op. Order [Docket No. 36].

Alexandria, Minnesota. Dr. Abbasi Dep. 29:2–12. Between November 21 and November 24, 2012, Wages also provided transition training about the Aircraft to Dr. Abbasi. Id. 33:5–9; 33:25–34:6. On November 24, 2012, Wages endorsed Dr. Abbasi to operate high performance airplanes, including the Aircraft. Id. 143:3–4; Schupp Aff. Ex. 11 at Pls. 172.

**1. Maintenance of the Aircraft by Twin Cities Aviation**

On December 19, 2012, while descending to the Anoka County, Minnesota airport, Dr. Abbasi was approaching too fast resulting in a "hard landing."[2] Dr. Abbasi Dep. 69:4–10. The Aircraft had to be towed from a snow bank, and maintenance had to be performed to repair damage caused by the hard landing. Id. 69:11–19.

On December 20, 2012, Twin Cities Aviation ("TCA"), which is located at the Anoka County airport, repaired the Aircraft. Schupp Aff. Ex. 13. The repairs included removing the left, right, and nose landing gear fairings. Id. TCA did not record this maintenance in the Aircraft's logbook. TCA's work order also states that the Aircraft's weight and balance was updated to reflect the removal of the landing gear fairings. Id. Again, there is no updated weight and balance entry in the Aircraft's logbook.[3]

TCA also preformed maintenance on the Aircraft's Tanis[4] engine heater on two separate occasions, January 21, 2013, and February 15, 2013. Id. These maintenance events are also not recorded in the Aircraft's logbook.

---

[2] The Aircraft's maintenance manual describes a hard landing as "any landing made at what is believed to be an excessive sink rate." Schupp Aff. Ex. 1 at 28.

[3] Dr. Abbasi does not disagree that Federal Aviation Regulations prohibit operating the Aircraft unless the maintenance had been properly recorded. See Dr. Abbasi Dep. 77–85.

[4] Tanis is a brand of heater that is installed in the engine for cold-weather operation. Sall Decl. Ex. 18 at 22:11–13.

## 2. Maintenance of the Aircraft by Weber's Aero Repair, Inc.

The record suggests additional maintenance was performed by Weber's Aero Repair, Inc. ("Weber's") in Alexandria, Minnesota around this time. According to the Aircraft's logbook, on December 20, 2012, Weber's replaced the right main tire inner tube and reversed the tire. Schupp Aff. Ex. 6 p. 46. However, according to Dr. Abbasi's pilot logbook and the TCA work order created on December 20, 2012, the Aircraft was in Anoka on December 20, 2012, and not in Alexandria, Minnesota. Compare Schupp Aff. Ex. 11 at Pls. 156 (showing that the Aircraft was in Anoka County on December 20, 2012), with Schupp Aff. Ex. 6 at 46 (showing Weber's December 20, 2012 maintenance entry). This inconsistency has not been explained.

Weber's made additional logbook entries in 2013. A January 14, 2013 logbook entry reflects that Weber's replaced the left tire and tightened the left gear and lower bracket. Schupp Aff. Ex. 6 at 46. Weber's also noted an oil change in the engine logbook dated January 3, 2013. Schupp Aff. Ex. 15. Finally, Weber's recorded a logbook entry dated December 21, 2013 for the installation of the Tanis heater. Id. This cannot be an accurate entry because December 2013 is about nine months after Dr. Abbasi crash landed the Aircraft on approach to the Alexandria airport and it was declared a total loss.[5]

## 3. Dr. Abbasi's Flights

Dr. Abbasi logged 45 entries in his pilot logbook between November 21, 2012 and March 29, 2013. Schupp Aff. Ex. 11 at Pls. 156–163. Dr. Abbasi was the pilot in command for each of those 45 logbook entries. Dr. Abbasi Dep. 160:13–17. As the pilot in command, Dr. Abbasi was

---

[5] Leading Edge correctly notes that since the entry physically appears after the January 3, 2013 entry, it cannot be explained by claiming the year was incorrectly recorded. Thus, it appears the entry was made after the crash.

responsible for conducting a pre-flight inspection. Id. 160:18–22. As part of his pre-flight inspection, Dr. Abbasi testified that he would have inspected the right flap and the hinges, actuation arm, bolts, and cotter pins. Id. 157:20–159:2. Dr. Abbasi also testified that during his pre-flight inspections he never noticed anything peculiar about the right flap bolt. Id. 160:9–11.

The Aircraft's Pilot's Operating Handbook instructs that the pilot in command should "check all hinges, hinge pins, and bolts for security" as part of the pre-flight inspection. Schupp Aff. Ex. 3 at Pls. 049. Additionally, the Aircraft's Flight Operations Manual instructs that the pre-flight inspection entails verifying that all bolts and cotter pins are in place on the right wing trailing edge. Schupp Aff. Ex. 17 at 3.12.

**C. The Crash**

On March 29, 2013, Dr. Abbasi was flying his family from Tea, South Dakota to Alexandria, Minnesota. As Dr. Abbasi was approaching the Alexandria airport, he deployed the flaps to 100% and then heard a loud bang from the right side of the Aircraft. Dr. Abbasi Dep. 168:23–169:4. The Aircraft started to roll to the left. Id. 169:2–4. Dr. Abbasi was unable to stabilize the Aircraft so he deployed the Aircraft's Parachute System. The Aircraft descended onto a frozen lake in Alexandria, Minnesota. Dr. Abbasi and his family were not seriously injured but the Aircraft was a total loss.

    **1. FAA's Investigation**

Federal Aviation Administration representatives Kevin Morris ("Morris") and David Nelson ("Nelson") traveled to Alexandria to investigate the incident. Sall Decl. Ex. 20 at 15:22–16:6. Morris and Nelson inspected the Aircraft after it had been transported from the crash scene to a nearby hanger. Id. 16:20–17:4. Morris also spoke with Dr. Abbasi on the phone

9

and corresponded with him by email. Id. 41:1–4; 50:1–4. In an email with Dr. Abbasi, Morris wrote "[e]vidence suggests that the bolt [connecting the rod end to the flap itself] backed out from the flap assembly." Sall Decl. Ex. 21.

**2. Plaintiffs' Expert**

David Klepacki ("Klepacki") was retained by Plaintiffs to serve as an expert witness. Kelpacki specializes in accident investigation and reconstruction, and holds an aeronautical engineering degree, an Airframe and Powerplant mechanic license, and a private pilot's license. Sall Decl. Ex. 22 ("Klepacki Dep.") 10:5–18; 118:20–22; Ex. 25 ("Klepacki Report"). Klepacki inspected the Aircraft on December 10, 2014 and February 16, 2017. Id. He also reviewed the Aircraft's maintenance records and logbooks, and read the depositions of key witnesses, including Miller, Stern, and Dr. Abbasi. Id. Klepacki concluded that the "safety-wire on the right-aft push-pull rod bolt, was most likely not re-installed by [Leading Edge] following one of their numerous maintenance sessions on the subject aircraft." Klepacki Report at 12.

**D. Summary Judgment**

Plaintiffs assert claims for negligence, misrepresentation, and breach of warranty. See Compl. Plaintiffs' theory of liability is that Leading Edge failed to properly install a safety wire on the right flap after performing maintenance between November 2010 through August 2011. Leading Edge moves for summary judgment, arguing that Plaintiffs have failed to identify evidence sufficient to create a genuine dispute of material fact.

### III. DISCUSSION

**A. Summary Judgment Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). "[S]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

On summary judgment, "[t]he moving party bears the burden to demonstrate that there is no issue of material fact. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of 'specific facts creating a triable controversy.'" Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004) (quoting Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)).

**B. Negligence**[6]

Under Minnesota law,[7] a negligence claim requires a plaintiff to prove a duty of care, breach of that duty, causation, and damages. Bjerke v. Johnson, 742 N.W.2d 660, 664 (Minn. 2007). Leading Edge argues that summary judgment is appropriate because there is no genuine issue of material fact as to whether a safety wire was present when the Aircraft left Leading Edge's possession.[8] Plaintiffs respond by attacking the credibility of the witnesses who testified that they observed the safety wire on the Aircraft, including Miller, Stern, and Alm. Plaintiffs also argue that because the Aircraft did not undergo any further maintenance to the right wing flap after it left Leading Edge's control, Leading Edge must be the party responsible for the missing safety wire. The viability of Plaintiffs' case is dependent on a conclusion that because there is no documentation of repair work being performed on the right wing of the Aircraft between August 3, 2011 and the March 29, 2013 crash, summary judgment should be denied.

The last recorded time the safety wire was removed during maintenance was during Miller's "R&R" of the right flap.[9] The "R&R" maintenance was completed sometime between

---

[6] The parties agree that if Plaintiffs' claim for negligence fails, so too do Plaintiffs' claims for misrepresentation and breach of warranty.

[7] Neither party suggests that any other state's law applies in this case. See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where parties do not raise choice-of-law issue).

[8] Leading Edge does not contest in this motion that the March 29, 2013 crash was caused by a bolt backing out of the flap assembly.

[9] Klepacki, Plaintiffs' expert, suggests that there are three other instances when Leading Edge could have cut or removed the safety wire: During the August 2011 annual inspection; after Stern performed the SB 2X-27-16 R1 bulletin to prevent possible asymmetric flap and over-extension conditions; and during the July 2012 annual inspection. Kelpacki Report at 4. However, no witness testified that removing safety wire was a part of an annual inspection, and Stern testified that the work related to the SB 2X-26-16 R1 bulletin was completed in the

12

November 20, 2010 and August 3, 2011, the later date being when the maintenance was recorded in the logbook.

Five witnesses testified that safety wire was installed on the right wing flap. Leading Edge's acting Director of Maintenance Miller testified that "without question" the safety wire was present after the work on the wing flap. Miller Dep. 9:12. Leading Edge shop foreman Stern does not specifically recall inspecting the Aircraft, but he testified that he would not have signed off on his annual inspection if safety wires were missing. Test pilot Alm testified that given the inherent risks of piloting an aircraft after it had been the subject of major repair, his pre-flight inspection was thorough. Alm testified that he would not have piloted the Aircraft if safety wires were missing. After Alm completed his test flight, Holloran—the Aircraft's prior owner's flight instructor—inspected the Aircraft. Holloran also testified that his inspection included checking for the presence of safety wires, and that he would not have flown the Aircraft if the safety wires were missing. Finally, although Bennett, who completed the second annual inspection, also does not specifically recall seeing the safety wires in place, he testified that based upon his experience and his signature on the annual inspection checklist, he is certain that safety wires were present. Bennett was the last person at Leading Edge to have inspected the Aircraft.

Plaintiffs have not adduced evidence showing that the safety wire was missing when the Aircraft left Leading Edge's control. Nor have Plaintiffs produced evidence that specifically shows Defendants' recollection with respect to safety wires is incorrect or inconsistent, or that

---

fuselage and did not require any manipulation of the hardware on the wing flap itself. Stern Dep. 33:4–8.

Leading Edge's maintenance or its record keeping are suspect.[10] Instead, Plaintiffs broadly attack the credibility of Miller, Stern, Alm, Holloran, and Bennett by arguing that no witness explicitly recalls observing the presence of safety wire on the Aircraft. The witnesses' lack of specific recollection, however, does not negate their testimony because each witness testified that it was their custom and practice to check for safety wire, and that they would either not have signed off on an inspection or flown the Aircraft if the safety wire was missing. Testimony of a specific recall of a seemingly insignificant fact, that is that a safety wire was in place as expected, would strain credulity given the lapse of several years time.[11]

Plaintiffs attack the credibility of each of Defendant's witnesses on collateral matters in an attempt to create a material fact. For example, Plaintiffs cite that only 1.6 hours elapsed in the Aircraft's Hobbs Meter[12] during Alm's test flight as proof that Alm's test flight could not have lasted the 2.2 hours he claimed. This discrepancy is unrelated to safety wires or Alm's routine for verifying the presence of safety wire. Plaintiffs correctly assert that "[a]ssessing the credibility of witnesses and evaluating the weight to assign to their testimony is the job of the fact-finder, and is not a function for the court on a motion for summary judgment." United States v. Dico, Inc., 136 F.3d 572, 579 (8th Cir. 1998). The focus must be on whether there is a

---

[10] Plaintiffs contend that since Leading Edge was the last entity to perform recorded maintenance on the Aircraft that involved removing the safety wire, Leading Edge must be responsible for the missing safety wire. The parties agree *res ipsa loquitur* does not apply here because Leading Edge did not have exclusive control of the Aircraft up to the crash. See Dupont v. Fred's Stores of Tenn., Inc., 652 F.3d 878, 883 (8th Cir. 2011) (explaining exclusive control requirement).

[11] For example, Miller was deposed roughly five and a half years after completing his work on the Aircraft.

[12] Hobbs time is a meter that records time in tenths of an hour when the engine is running, regardless of whether the plane is in the air or on the ground. Alm Dep. 20:24–21:1; 21:18–21.

genuine issue of material fact and identifying flaws in a collateral portion of a witness' testimony does not necessarily undermine that testimony in its entirety.

In assessing whether the is a triable issue of fact, significant intervening events after the Aircraft left Leading Edge must be considered. These events span 114.1 hours of flight time over an eight and a half month period before the crash occurred. The intervening events during this time period include a hard landing and subsequent inspections and maintenance performed by three companies other than Leading Edge—DDA, TCA, and Weber's.[13] Plaintiffs also rely on the inaccurate and incomplete logbooks maintained by Dr. Abbasi to conclude to that no maintenance on the right flap was performed after Leading Edge's work back in 2010 or 2011. The maintenance records of TCA and Weber's are not accurately reflected in the Aircraft's logbooks, suggesting that additional maintenance on the Aircraft may have been performed by either TCA or Weber's that was not recorded in the logbooks. Additionally, Dr. Abbasi failed to get the Aircraft approved for return to service after the hard landing, as the Federal Aviation Regulations require. Finally, Plaintiffs' expert, Klepacki, confirms that the new flaps installed by Leading Edge showed evidence or markings, suggesting the flaps had been safety-wired at some point. Klepacki Report at 8. Therefore, Plaintiffs' expert agrees that sometime after Miller completed the "R&R" between November 2010 and August 2011, the new flap had been safety wired.

Klepacki's conclusion that "[t]he safety-wire, on the right aft push-pull rod bolt, was <u>most likely</u> not re-installed by [Leading Edge]," is not sufficient to permit a reasonable juror to

---

[13] DDA completed a pre-purchase inspection of the Aircraft that identified nine discrepancies all unrelated to the right flap during this time period.

15

conclude that the safety wires were missing when the Aircraft left Leading Edge's control. Klepacki Report at 12 (emphasis added). Such a conclusion would require a jury to ignore the consistent and unrebutted testimony of five witnesses who all testified that safety wire was definitely present. The expert's speculative conclusion does not create a genuine issue of material fact.

"The nonmoving party may not rely on mere speculation or conjecture" to defeat summary judgment Bayside Holdings, Ltd. v. Viracon, Inc., 709 F.3d 1225, 1228 (8th Cir. 2013). Rather, Plaintiffs "must affirmatively show that a material issue of fact remains in dispute and may not simply rest on the hope of discrediting the movant's evidence at trial." Matter of Citizens Loan & Sav. Co., 621 F.2d 911, 913 (8th Cir. 1980).

Plaintiffs do not offer competing testimony or "identify and provide evidence of 'specific facts [to] creat[e] a triable controversy.'" Howard, 363 F.3d at 800 (quoting Jaurequi, 173 F.3d at 1085). Instead, Plaintiffs request that the Court ignore the unequivocal testimony of the five witnesses who stated that they either would not have flown the Aircraft or signed off on their inspection if safety wire was not present. Plaintiffs seek an inference that since Leading Edge was the last entity to record performing maintenance that required removing the safety wire—some 19 months before the crash, Leading Edge must have incorrectly replaced the safety wire. Plaintiffs are only entitled to the benefit of all reasonable inferences, not all possible inferences. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The inference Plaintiffs advocate is unreasonable, and falls short of creating a genuine issue of material fact. Leading Edge is therefore entitled to summary judgment.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Leading Edge Aviation Services, Inc.'s Motion for Summary Judgment [Docket No. 48] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

BY THE COURT:


     s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 29, 2017.